# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| LINDSAY HELD, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) )   Civil Action No. 3:11-CV-00105-SRU |
| AAA SOUTHERN NEW ENGLAND, | ) ) ) |
| Defendant. | ) ) ) |

## DEFENDANT'S OPPOSITION TO CLASS CERTIFICATION

Defendant AAA Southern New England ("AAA SNE" or the "Club") respectfully submits its Memorandum in Opposition to the Motion for Class Certification of Plaintiff Lindsay Held ("Held" or "Plaintiff").

## I.      INTRODUCTION

This case centers around Plaintiff's argument that the Club's membership renewal policy unfairly deprives individuals of a full year's membership for which they have paid.  Plaintiff also argues the Club fails adequately to disclose its renewal policy to members.  Finally, Plaintiff contends that having this case proceed on a class-wide basis is appropriate, manageable, and otherwise would result in substantial benefits to the Court and the parties.  Plaintiff is wrong.

First, members receive at least 365 days of membership in exchange for payment of membership dues.  Accordingly, the Club's policy is more than fair, and certainly comports with any arguable contractual obligation.  Second, the Club discloses its policy to members, both verbally and in various writings.  Third, and most important for purposes of the pending Motion, record evidence establishes that a class action is not the proper vehicle to address the asserted

causes of action in this case.  Notably, last month a California state court reached precisely the same conclusion in a virtually identical case.

In *Thompson v. Automobile Club of Southern California*, Case No. 30-2009-00285190 (Superior Court of California, Orange County)[1] the plaintiff, who was represented by the same counsel as Mr. Held, asserted various claims under precisely the same "back-dating" theory at issue here.  The California court denied plaintiff's motion for class certification, finding, among other things, class members were not readily ascertainable, common issues did not predominate, and a class action would not be a superior means to adjudicate that case.  The same is true for this case.

While the ultimate merits of Plaintiff's claims are not at stake in the pending Motion, the Court nevertheless should consider record evidence to determine what actually is in dispute and how such issues would be tried.  Here, that means a realistic consideration of the Club's membership renewal policy.

AAA SNE is a  membership organization that makes available to its members a variety of benefits and services, including peace of mind that 24-hour road-side assistance will be provided, if and when the need arises.  A new member is entitled to receive AAA SNE benefits and services as soon as initial membership dues are paid.  Depending on various factors, including the day of the month an individual joins the Club, a member will receive at least 365 days of membership benefits, and could receive up to 13 months of benefits in exchange for payment of initial membership dues.

---

[1] A copy of the Order denying class certification in *Thompson* is attached as Exhibit B to the simultaneously filed Affidavit of Kent D.B. Sinclair ("Sinclair Aff.").  Plaintiff also simultaneously submits the Affidavit of Mary Wyatt ("Wyatt Aff.") and the Affidavit of Thomas Terwilliger ("Terwilliger Aff.") in support of this Opposition.

Recognizing that continuity of membership is important to members, as evidenced in part by the fact that each year approximately 90% of members renew their membership, AAA SNE's renewal policy is designed to ensure there is no lapse in benefits for those who elect to renew. Specifically, to facilitate continuity of membership, benefits associated with an individual's AAA SNE membership remain available for 90 days following an individual's membership renewal date.  And record evidence establishes that members, including Mr. Held, frequently avail themselves of Club benefits for no additional charge during this 90 day period.  Thus, the entire premise for Plaintiff's case – that the so called "back-dating" policy results in individuals effectively being charged membership dues for a 90 day period during which they allegedly receive no benefits  – is simply wrong.

Importantly, members always have the option not to renew their AAA SNE membership.[2] If the member does not renew within 90 days following the stated membership renewal date, the membership is deemed to be cancelled.  Pursuant to Club policy, if a member elects not to renew, but nevertheless wants to avail him or herself of membership benefits, the individual typically will be required to apply for a new membership, pay new membership dues, and pay additional applicable charges including a $35 same day service fee.  In such situations the individual also will lose other benefits associated with membership longevity.

It is equally important to recognize that, contrary to Plaintiff's assertion, the Club communicates its renewal policy to members in myriad ways.   Some communications are written, other communications are verbal.  In fact, the Plaintiff himself had verbal communications with a Club representative in which the renewal policy was discussed to him.

---

[2] Individuals also have the option to cancel their membership at any time.

And record evidence highlights the unique nature of each communication between the Club and its members.

These undisputed facts effectively ring the death knell for Plaintiff's individual claims and highlight why this case should not proceed as a class action.  Specifically, as the California court concluded in *Thompson v. Automobile Club of Southern California*, the putative class is overly broad and otherwise not ascertainable because it includes individuals who would not be entitled to relief on any of the asserted claims because they (1) received services during the 90 day period in question; (2) had the renewal policy expressly disclosed to them; and / or (3) were not injured by the Club's renewal policy because they were economically better off under the renewal policy than they would have been if they had begun a new membership and been charged additional fees such as a $35 same day service fee.  For each of the same reasons, individual issues predominate and a class is not a superior means to adjudicate this case.  Likewise, Held's individual situation and claim makes him atypical.  Accordingly, Plaintiff's motion for class certification should be denied.

## II.       FACTUAL BACKGROUND

### A.       OVERVIEW OF AAA SOUTHERN NEW ENGLAND

 AAA SNE is a not-for-profit membership organization.  The Club's history dates back to 1900 and today has approximately 3 million members in Rhode Island, Connecticut and Massachusetts. (Wyatt Aff. ¶¶ 3,4).  True to its roots, as a club for automobile enthusiasts, many of the benefits and services available to AAA SNE's members relate to travel, such as 24-hour road-side assistance, maps and travel guides, issuance of International Driving Permits, and travel agent services. (*Id.* ¶ 6).

Club members can avail themselves of numerous additional services and benefits, including: (i) discounts for travel and entertainment related services and products, as well as discounts for other goods and services (referred to as "Show Your Card and Save" programs); (ii) financial services (e.g., auto loans, mortgage loans, auto buying assistance and education finance seminars); (iii) insurance services (e.g., auto, life, long term care, and dental insurance); (iv) trip continuation reimbursement of up to $500.00 if a car is disabled for more than 24 hours; (v) notary public services; and (vi) bail bond protection.  The specific services available to members change over time and vary depending on membership level and geographic location. (*Id.*)

The Club typically has no way to determine, and therefore has limited, if any records reflecting, which members availed themselves of the thousands of discounts available at the thousands of locations nationwide, let alone how many times, when, or the specifically attributable value of such benefits.  While the Club cannot know the specific savings any particular member may have received in connection with his or her use of any Club affiliated discount program, through market research, the Club does know that on average members typically save approximately $110 per household per year by availing themselves of these discounts. (*Id.* ¶ 7).

1.      **Membership Levels and Associated Fees**

AAA SNE currently has three levels of membership — Basic, Plus, and Premier.[3] Within each category of membership, there is a Primary member and there also may be one or more Associate members.  (*Id.* ¶ 5).  An individual cannot obtain a Plus membership unless he or

---

[3] Individuals who have a Plus or Premier membership can avail themselves of services and benefits in addition to those made available to individuals with a Basic membership.

she maintained a Basic membership for at least the preceding two years.  (*Id.* ¶ 8).  Similarly, an

individual cannot obtain a Premier membership unless he or she maintained a Plus membership

for at least the preceding one year. (*Id.* ¶ 10).

AAA SNE membership dues vary based on membership category as well as geography.

(*Id.* ¶ 12).  Moreover, dues have changed over time. (*Id.*)   For example, in 2005 dues for a

Massachusetts resident with a Basic membership were $48.  Today, Basic membership dues for a

Massachusetts resident are $52 and Plus membership dues are $82. (*Id.*)  In contrast, Basic

membership dues for a Connecticut resident today are $58 and Plus membership dues are $88.

(*Id.*)  The dues a class member may have paid also can be impacted by the fact that the Club

periodically offers promotional opportunities to reduce otherwise applicable dues or fees. (*Id.* ¶

47).

The total amount paid by any given member also will depend on whether he or she was

charged an enrollment fee when they joined the Club.[4]   Separate and apart from the Enrollment

Fee, if an individual requests road service the same day he or she becomes an AAA SNE

member, the individual typically is charged a  same day service fee. (*Id.* ¶ 17).[5]  Complicating

matters even further, the Club offers group memberships, the fees for which vary from group to

---

[4] Although each situation is unique, it is AAA SNE's general policy to charge a new member an
enrollment fee ("Enrollment Fee") in addition to the otherwise applicable dues.  The Enrollment
Fee, however, may be waived in certain circumstances.  For example, if a member elects to
participate in the Automatic Renewal Program the Enrollment Fee typically is waived.  The
Enrollment Fee also may be waived in connection with various marketing campaigns. (*Id.* ¶ 15).
The Enrollment Fee has varied over time and from place to place throughout the Club's territory.
Currently, the Enrollment Fee for a Primary member is $15.00 and $5.00 for an Associate
member. (*Id.* ¶ 16).

[5] The amount charged for the same day service fee has changed over time.  Currently, the same
day service fee is $35. (*Id.* ¶ 17).

group. (*Id.* ¶ 13).   Membership may also be provided through a gift membership that is paid for by someone other than the Primary or Associate member. (*Id.* ¶ 14).

### 2.        New Membership Process

An individual can join AAA SNE in a variety of ways, including online at the Club's website (www.web.aaasne.com), by mail, over the telephone, or in person at one of AAA SNE's local branch offices. (*Id.* ¶ 18).   A new member can receive AAA SNE benefits and services as soon as membership dues are paid. (*Id.* ¶ 19).

Depending on the day of the month initial membership dues are paid, the initial membership period will be scheduled to renew one year after the first or fifteenth day of the month following receipt of payment. (*Id.* ¶ 19).   For example, if an individual pays his initial AAA SNE membership on January 1, 2011, his membership would be scheduled to renew January 15, 2012.   If an individual pays his initial AAA SNE membership on January 16, 2011, his membership would be scheduled to renew February 1, 2012. (*Id.*).[6]

### 3.        Continuity of Membership

The Club recognizes and rewards longevity of membership in a variety of ways.   For example, the Club provides additional benefits to individuals who have maintained uninterrupted membership for multiple years.   The specific nature of the additional benefits has changed over time and also has varied from one geographic location to another.   By way of example, an individual with a new Basic level membership can receive four road service calls in a given membership year.   In contrast, an individual who has retained a Basic level membership for three

---

[6] As discussed *infra*, prior to its merger with AAA SNE in 2008, the Connecticut Motor Club had a slightly different procedure.   Specifically, the initial membership period was scheduled to renew one year after the first day of the month following receipt of payment.   (Terwilliger Aff. ¶ 12).

years or more can receive five road service calls in any given membership year. (Wyatt Aff. ¶ 36).

Continuity of membership also impacts an individual's ability to obtain enhanced membership levels. For example, an individual typically is ineligible for Plus membership unless he or she has maintained a Basic level membership for at least two years and is ineligible for Premier without having maintained a Plus level membership for at least one year. (*Id.* ¶ 37). Longevity of membership also may impact the amount a member saves for automobile insurance services. (*Id.* ¶ 38).

Members attach great value to the fact they have been a longstanding AAA member. For example, AAA received a letter from a woman who had been a Club member since ___. (*Id.* ¶¶ 34, 35). The letter highlighted the member's desire to maintain her longstanding membership, going so far as to state that she was willing to pay an additional fee, if necessary to do so. (*Id.* ¶ 35).

Empirical data provides further support for the notion that members value their longstanding relationship with the Club. (*Id.* ¶¶ 39-42); Maronick report.[7] Specifically, each year approximately 90% of all AAA SNE members renew their membership. (Wyatt Aff. ¶ 39). Moreover, on average, AAA SNE members typically retain their Club membership for 10 years. (*Id.* ¶ 43).

---

[7] A copy of a report prepared by Thomas J. Maronick, Professor of Marketing at Towson University entitled "An Empirical Analysis of Consumers' Experiences with Auto Club Memberships" ("Maronick Report") is provided at Sinclair Aff. Ex. C.

4.        **Membership Renewal Process**

Membership renewal notices are mailed approximately 45 days before the member's renewal date. (Wyatt Aff. ¶ 22).[8]   AAA SNE membership renewal notices identify the requisite membership renewal dues.  Membership renewal notices also expressly set forth the renewal date for the continued membership.  The renewal date for a continued membership typically is 12 months after the initial membership renewal date.  For example, if a member's initial renewal date is January 15, 2012, the renewal notice will inform the member that the renewal date for the continued membership is January 15, 2013. (*Id.*)  The first membership renewal notice sent to members approximately 45 days before the member's renewal date also includes an updated membership card.  The updated membership card always has clearly embossed on it in large font the updated membership renewal date. (*Id.* ¶ 24).

If a member does not renew by his or her membership renewal date, AAA SNE typically sends additional renewal notices.  The number and frequency of renewal notices has varied since 2005, depending on geographic location and time period.  Currently, the typical schedule for follow-up renewal notices is to send a second renewal notice by mail approximately five days after the membership renewal date.  If the member has not responded to the second renewal notice AAA SNE typically sends a third renewal notice approximately 30 days after the membership renewal date.  If the member has not responded to the third renewal notice AAA SNE typically sends a fourth renewal notice approximately 45 days after the membership

---

[8] An individual may renew his or her membership through a variety of methods including over the Internet, by mail, over the telephone, registration in the AAA SNE Automatic Renewal Program, or in person at an AAA SNE branch office. (*Id.* ¶ 29).

renewal date.[9]  The second, third and fourth renewal notices always expressly set forth the renewal date for the continued membership, which is 12 months after the previous membership renewal date.  For example, if a member's initial renewal date is January 15, 2012, each successive iteration of the renewal notice will inform the member that the renewal date for the continued membership is January 15, 2013. (*Id.* ¶ 26).

    To facilitate continuity of membership, benefits associated with an individual's AAA SNE membership remain available for 90 days following the stated membership renewal date. Such benefits include, but are not limited to (1) travel services; (2) "Show Your Card and Save" discounts; (3) financial services; (4) insurance services (e.g., auto, life, long term care, and dental insurance); (5) bail bond protection; (6) notary public service; and (7) receipt of AAA SNE's publication *Horizons*. (*Id.* ¶ 30).   Roadside service also continues to be available to members following the stated membership renewal date.  During the 15 days following the stated membership renewal date, the Club will provide a member with roadside service without any additional charge or payment of renewed membership dues.  During the period 16 to 90 days following the stated membership renewal date, the Club typically will require the member to renew his or her membership before providing roadside assistance service.  If the individual renews his or her membership the Club will provide the requested roadside service and will not charge a $35 same day service fee.  If the individual elects not to renew the membership, but rather, elects to begin a new membership, the individual will be charged the fees associated with a new membership, including a same day service fee. (*Id.* ¶ 31).

    Individuals who renew their membership within 90 days following the stated membership renewal date are not charged an Enrollment Fee or a same day service fee for roadside

---

[9] The Club also periodically sends emails to members encouraging them to renew their memberships.

assistance. (*Id.* ¶¶ 32, 33).   As discussed above, individuals who renew their membership also retain additional benefits associated with longevity of membership. (*Id.* ¶ 34).

Importantly, approximately 90% of all AAA SNE members renew their memberships each year. (*Id.* ¶ 39).   Of the members who renew, 83%  pay their renewal dues on or before their respective membership renewal date and 99.9% pay their membership dues within 90 days after the stated membership renewal date.  (*Id.* ¶¶ 40-42).

An individual always has the option not to renew his or her AAA SNE membership.  If the member does not renew within 90 days following the stated membership renewal date, the membership is cancelled.  If a membership is cancelled but an individual subsequently wants to avail him or herself of membership benefits, the individual typically will be required to apply for a new membership and will be subject to applicable charges including a same day service fee. (*Id.* ¶ 45).[10]

###### 5.    Member Communications

The Club periodically undertakes marketing campaigns designed to encourage individuals to join AAA SNE for the first time as well as efforts to encourage former members to re-join.  The Club uses various forms of media to facilitate its marketing efforts, including direct

---

[10] The Club's general policy has been to charge an Enrollment Fee to individuals who do not renew their membership within 90 days following their membership renewal date, but subsequently elect to sign up anew for Club membership.  Given computer system limitations, however, beginning in November 2010, the Club has been unable to charge an Enrollment Fee for individuals who (1) had been a Club member; (2) that failed to renew their membership within 90 days following the previously stated membership renewal date; but (3) nevertheless elect to sign up anew for Club membership during the 90 - 180 day period following the previously stated membership renewal date.  The Club does charge an Enrollment Fee for individuals who (1) had been a Club member; (2) that failed to renew their membership within 90 days following the previously stated membership renewal date; but (3) nevertheless elect to sign up anew for Club membership more than 180 days after the previously stated membership renewal date. (*Id.* ¶ 46).

mail, radio, television, digital, print, and special events.  Recognizing that individuals make

purchase decisions based on a wide range of factors, the Club's marketing campaigns vary from

situation to situation.  For example, different marketing campaigns highlight different Club

benefits.  At various times, AAA SNE has offered to waive the Enrollment Fee.  AAA SNE has

offered other incentives, including reduced membership dues for a period of time. (*Id.* ¶ 47).

Separate and apart from the marketing campaigns, AAA SNE communicates with its

members in many different ways. (*Id.* ¶ 49).  Communication with each member is unique, and

varies depending on the circumstances. (*Id.*)  Communications can be verbal or in writing. (*Id.*)

Members verbally communicate with the Club in one of several ways.  For example, a

member can visit a branch office and have a conversation directly with a Club representative.

Such communications are not recorded. (*Id.* ¶ 50).  A member also can call the Club over the

telephone and speak with a Club representative. (*Id.*)[11]  Notably, but not surprisingly, some of

these verbal communications involve the Club's membership renewal policies, and application of

those policies to the facts and circumstances specific to an individual member.  (*Id.*)

The Club also sends myriad written communications to members.  For example, as

discussed above, the Club mails written renewal notices to members each year.  In addition, the

Club periodically sends marketing materials that are targeted to specific members and highlight a

wide range of unique offers or other Club benefits. (*Id.* ¶ 51).

In addition to the many other forms of communication, the Club sends various written

materials when an individual signs up as a new member.  These materials include a member

---

[11] Such conversations may or may not be recorded.  To the extent a conversation is recorded, the recording is kept for a relatively limited period.  When a member calls, the Club representative, may or may not take notes regarding the content of the communication.  To the extent notes are taken, they may be stored in a database known as MCT. (*Id.* ¶ 50).

handbook ("Handbook") (*Id.* ¶ 52).[12]  The Handbook is intended to be a general reference guide for members.  It also is a marketing tool in that it highlights Club benefits and services. (*Id.* ¶ 55).  The Handbook contains information regarding the Club's renewal process under the heading "General Information."  The specific Handbook language regarding the Club's renewal process has changed numerous times since 2005. (*Id.* ¶ 54).[13]

### 6.   AAA SNE Merger With The Connecticut Motor Club

AAA SNE's membership and footprint expanded significantly in 2008 when it merged with the Connecticut Motor Club ("CMC") (*Id.* ¶ 56).   Prior to the Merger CMC and AAA SNE membership policies and practices varied in several respects.  For example, prior to the Merger AAA SNE new membership dates began on the 1st or 15th or each month.  In contrast, CMC new membership dates always began on the 1st or each month. (Wyatt Aff. ¶ 52); (Terwilliger Aff. 12).  A second example is that prior to the merger CMC charged a same day service fee where applicable — AAA SNE did not.  (Wyatt Aff. ¶ 52); (Terwilliger Aff. 10).  A third difference is that, unlike AAA SNE, as it related to Plus level memberships, CMC offered a "family membership" pursuant to which any dependent living within the Primary Member's household had the ability to become an Associate Member, and, as such, could receive the benefits and services offered by CMC. (Terwilliger Aff. 8).  Another example of a difference between the two clubs pre-merger centered around road-side services.  Specifically, if a CMC member exceeded his or her allotted road side service calls a surcharge may have been applied upon renewal of the

---

[12] The Club only sends a written copy of the Handbook once to each member.  A new Handbook is not sent each year when a member renews his or her membership.  The Club posts the Handbook on the Club's website. (*Id.* ¶ 52).

[13] The Club typically modifies the Handbook twice a year.  When the Handbook is modified, an updated written copy is not sent to members.  An updated version of the Handbook, however, is posted on the Club's website. (*Id.* ¶ 53).

individual's membership.  In contrast, if an AAA SNE member exceeded his or her allotted road side service calls the member would have been required to pay an additional fee at the time the road side service was provided. (Wyatt Aff. ¶ 52); (Terwilliger Aff. 11).   Prior to the merger membership dues and other fees also varied between the Clubs.  (Wyatt Aff. ¶ 12); (Terwilliger Aff. 7).  Even though the Merger became effective on July 1, 2008, the CMC dues structure and rates remained in effect until approximately August 2009 when CMC and AAA SNE databases and other systems were merged. (Terwilliger Aff. 9).  Finally, each Club had their own version of a member Handbook. (Wyatt Aff. ¶ 52).  Following the Merger, representatives from both clubs reviewed all policies and procedures and eventually agreed on a collective set of practices that would be applied on a going forward basis. (Wyatt Aff. ¶ 52).

### B.   LINDSAY HELD

The named Plaintiff, Lindsay Held, is a highly educated individual, graduating from Dartmouth College in 1988 and Columbia Law School in 1991.  Held Dep. at 14:10-22.[14]  After law school he worked for Latham & Watkins, Williams & Connolly  and Baker & Botts.  *Id.* at 53:17 - 55:23.  In 1999 he went back to school, receiving an MBA from the Warton School in 2001.  *Id.* at  14:23 - 15:5, 55:25 - 56:2.  He held various positions after business school including Vice-President Business Affairs and Assistant General Counsel at Cantor Fitzgerald. *Id.* at 30:23-25.

During the period 2006 through 2008 Held work as an attorney at the Meiselman law firm, the attorneys for Plaintiff and the proposed class in this case.  *Id.* at 30:3-5, 32:8-16, 40:18 - 41:20.  During his tenure at the Meiselman law firm, Held represented several plaintiffs who had filed suit alleging various clubs improperly "back-dated" their memberships.  Specifically, while

---

[14] Copies of the relevant portions from the Held deposition are attached at Sinclair Aff. Ex. A.

at the Meiselman law firm Held worked on *Dupler v. Costco Wholesale Corp.,* a companion case

to *Dupler* that had been filed in California, and a third "back-dating" case that had been filed in

the New York Supreme Court.  *Id.* at 38:2 - 43:14, 45:17 - 46:11.  Notably, Held's sister, Rhonda

Dupler, who also is an attorney, served as the named plaintiff in *Dupler v. Costco Wholesale*

*Corp.  Id.* at 43:18-19, 57:23-25.

> 1.     **Held's AAA Membership**

Held joined CMC in August, 2004.  *Id.* at 76:12-17.  He joined because he was interested

in obtaining various membership benefits and services, including discounts at hotels and other

businesses.  *Id.* at 82:7-12.  Importantly, Held confirmed that approximately six times each year

he took advantage of various Club benefits including road-side assistance and discounts on hotel

stays and car rentals.  Held Dep. at 86:14 - 88:11.  He also confirmed that, not surprisingly, he

has no records reflecting what benefits he accessed, the dates he did so, or the amounts saved as

a result. *Id.* at 88:12 - 88:16.

When Held initially joined CMC his membership fees were discounted by $15.  (Wyatt

Aff. ¶ 59).  The discount, in part, was in exchange for Held agreeing to sign up for the Club's

Automatic Renewal Program.  Specifically, pursuant to the Automatic Renewal Program Held

agreed that his credit card could be charged automatically to renew his membership each year.

(*Id.*)  Held's membership was scheduled to renew on October 1, 2005 which was approximately

13 ½  months after he initially became a member. (*Id.*)

In August 2005, CMC sent Held a membership renewal notice.  CMC also sent Held an

updated membership card.  The renewal notice and updated membership card reflected the fact

that the renewal date for Held's continued membership would be October 1, 2006.  The renewal

documentation also informed Held that consistent with his prior agreement to participate in the

Automatic Renewal Program, his credit card would be charged the requisite amount for the membership renewal fees. (Wyatt Aff. ¶ 60).

CMC attempted to charge Held's credit card for the membership renewal fees. The attempted credit card transaction, however, was rejected. Accordingly, records reflect that CMC sent Held five additional membership renewal notices between October 6, 2005 and November 28, 2005. Notwithstanding these subsequent notices, Held did not pay the applicable membership renewal dues. Accordingly, CMC cancelled Held's membership on January 5, 2006 which was approximately 95 days after the stated membership renewal date. (Wyatt Aff. ¶ 61).

Held subsequently called CMC and was told that his prior CMC membership had been cancelled. Accordingly, Held joined CMC as a new member. He was charged applicable membership fees of $55.00. He also was charged a new CMC member Enrollment Fee, which, at the time was $15.00. (Wyatt Aff. ¶ 62).

In October 2006, CMC sent Held a membership renewal notice. CMC also sent Held an updated membership card. The membership notice and membership card reflected the fact that Held's new membership renewal date would be January 1, 2008. Records reflect that CMC sent Held four additional membership renewal notices between mid-December 2006 and mid-February 2007, each one specifying the new membership renewal date of the January 1, 2008. (Wyatt Aff. ¶ 63).

Held contacted CMC on February 23, 2007, which was within 90 days following his stated membership renewal. During this call Held requested road-side service. His membership was renewed when he agreed to pay the applicable membership renewal fees, which at the time were $62.00. Importantly, Held was not charged a new member enrollment fee nor was he charged a same day service fee. (Wyatt Aff. ¶ 64).

16

In October 2007, CMC sent Held a membership renewal notice.  CMC also sent Held an updated membership card.  The renewal notice and membership card reflected the fact that Held's new membership renewal date would be January 1, 2009.  Records reflect that CMC sent Held four additional membership renewal notices between mid-December 2007 and mid-February 2008, each one specifying the new membership renewal date of the January 1, 2009. (Wyatt Aff. ¶ 65).

February rolled around once again, and consistent with his emerging pattern, Held contacted CMC on February 23, 2008 to request road-side service.  His membership was renewed when he agreed to pay his membership renewal fees, which at the time were $62.00. The Club provided the requested road-side service.  Consistent with Club policy, Held was not charged a new member enrollment fee nor was he charged a same day service fee. (Wyatt Aff. ¶ 66).

As in prior years, in October 2008, CMC sent Held a membership renewal notice.  CMC also sent Held an updated membership card.  The renewal notice and membership card reflected the fact that Held's new membership renewal date would be January 1, 2010.  Records reflect that CMC sent Held four additional membership renewal notices between mid-December 2008 and mid-February 2009, each one specifying the new membership renewal date of the January 1, 2010. (Wyatt Aff. ¶ 68).

Held once again contacted CMC to request road-side service within 90 days following his stated membership renewal, this time a week earlier than normal (February 15, 2009).  He agreed to pay his membership renewal fees, which at the time were $62.00 for the Primary Member and $27 for the Associate Member. [15] The Club provided the requested road-side service.  Held was

---

[15] Held added his wife as an Associate Member in 2008.  (Wyatt Aff. ¶ 67).

not charged a new member enrollment fee nor was he charged a same day service fee. (Wyatt Aff. ¶ 69).

In November 2009, Held again received a renewal notice and new membership cards. By this time, the post-merger conversion of CMC's computer system used for membership renewal processing was completed and Held's renewal was now running on AAA SNE's system. The renewal notice and membership card reflected the fact that Held's new membership renewal date would be January 1, 2011. AAA SNE sent Held three additional membership renewal notices between mid-December 2009 and mid-February 2010, each one specifying the new membership renewal date of the January 1, 2011. (Wyatt Aff. ¶ 70).

As he had done in each of the preceding three years, Held contacted the Club in February, 2010 to request road-side service. The AAA SNE representative who took Held's call explained to him that his dues were to have been paid the previous month. The representative also referenced the Club's grace period for road-side assistance and informed Held that if he renewed his membership more than 90 days after the stated renewal date he would be charged a $30.00 fee if he needed roadside assistance.[16]   Armed with this information, Held agreed to pay his membership renewal fees, which at the time were $62.00 for the Primary Member and $27 for the Associate Member. Held was not charged an enrollment fee nor was he charged a same day service fee. (Wyatt Aff. ¶ 71).

AAA SNE sent Held a membership renewal notice and updated membership card in November, 2010. Consistent with its normal practice, the Club sent Held several additional membership renewal notices. Unlike each of the prior 3 years, Held did not call AAA SNE for road-side service in February, 2011. Instead, he elected not to renew his membership within 90

---

[16] A true and correct transcription of the recording from Held's February 7, 2010 call with the AAA SNE representative is attached at Wyatt Aff. Ex. K.

days following his membership renewal date.  Accordingly, Held's membership with AAA SNE was cancelled. (Wyatt Aff. ¶ 72).

## III.    ARGUMENT

A case can proceed as a class action only if the Plaintiff satisfies his burden of establishing all four requirements of Rule 23(a) — numerosity, commonality, typicality and adequacy of representation.  In addition, Rule 23(b)(3), which governs the proposed class action here, requires Plaintiff to show that "questions of law or fact common to class members predominate over any questions affecting over individual members" -- the predominance prong -- "and that class treatment would be superior to individual litigation" -- the superiority prong. Fed. R. Civ. P. 23(b)(3).*Fed.R Civ.P. 23; Simon II Litig. v. Philip Morris USA Inc.*, 407 F.3d 125, 132-133 (2d Cir. 2005)*;Cashman v. Dolce International/Hartford*, 225 F.R.D. 73, 90 (D. Conn. 2004).

The U.S. Supreme Court has mandated that district courts conduct a "rigorous analysis" of the Rule 23(a) requirements.  *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982).  Class certification is appropriate only if the Court finds, by a preponderance of the evidence, that each requirement of Rule 23 has been met.  *Austen v. Catterton Part.,* 268 F.R.D. 146 (D. Conn. 2010), citing *In re Initial Public Offering Securities Lit. (In re IPO),* 471 F.3d 24, 27 (2d Cir. 2006).  In practice, this means that a district judge can only determine whether each of the Rule 23 requirements has been met "if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met."  *In re IPO*, 471 F.3d at 41.  "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23

requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." *Id.* Therefore, in order to determine whether the requirements of Rule 23 have been met, the "district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Id.*

### A.   PLAINTIFF CANNOT ESTABLISH THAT COMMON ISSUES PREDOMINATE

The "predominance" requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231 (1997).   The requirement's purpose is to "ensure [] that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615.

Where, as here, injury is an element of a plaintiff's claim, "[t]o meet the predominance requirement of Fed. R. Civ. P. 23 for class certification, the plaintiffs must show that injury-in-fact, or impact, can be proven by evidence common to the class." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,* 256 F.R.D. 82, 88 (D. Conn. 2009).   Courts within the Second Circuit have determined that if a finding of injury is not subject to class-wide proof and would require individual and fact intensive determinations, common issues cannot predominate. *See, e.g.,* ;   *In re IPO,* 471 F.3d at 43 (upholding denial of class certification where individual questions arose as to which putative class members were injured by the defendant's conduct); *In re Currency Conversion Fee Antitrust Litig., N.A*., 230 F.R.D. 303, 310-11 (S.D.N.Y. 2004) (finding certification inappropriate under Rule 23(b)(3) because each plaintiff had to prove they in fact had been injured.); *see also, McLaughlin v. American Tobacco Co.,* 522 F.3d 215, 228 (2d Cir. 2008) (the Second Circuit stated "out-of-pocket losses cannot be shown by common

evidence because they constitute inherently individual injury … plaintiffs cannot meet their burden by showing that injury is amenable to common proof.").

      1.      **Determining Whether Class Members Availed Themselves of Club Benefits During the 90 Day Period Will Require Individualized Analyses**

Record evidence clearly establishes that, contrary to Plaintiff's assertion, benefits associated with an individual's AAA SNE membership remain available for 90 days following the stated membership renewal date. (Wyatt Aff. ¶ 31).  If, during this 90 day period an individual actually used one or more Club services or otherwise availed himself of Club benefits such as hotel discounts, he would have no basis to pursue a claim in this case.  To that end, record evidence establishes that Held repeatedly used the Club's road-side services during the 90 day period without being assessed fees that otherwise would have been charged had he elected to begin a new membership. *See supra,* pp. 15-19.  This fact alone effectively torpedoes his claim.

Putting that aside, however, it is important to recognize that he Club has limited, if any records reflecting, which members availed themselves of the thousands of discounts available at the thousands of locations nationwide, let alone how many times, when, or the specifically attributable value of such benefits.  (*Id.* ¶ 7).[17]  Because such records do not exist, it clearly would be impossible, absent individualized analyses, to determine whether each member of the putative class in fact availed him or herself of Club benefits during the 90 days following their stated membership renewal date.

---

[17] Held testified that in addition to using the Club's road-side services multiple times, he also availed himself of other Club benefits.  Not surprisingly, however, Held has no records reflecting what benefits he accessed, the dates he did so, or the amounts saved as a result. Held Dep. at 88:12 - 88:16.

2. **Determining Whether Class Members Were Damaged**
**Will Require Individualized Analyses**

Held asserts in his Complaint that he effectively was "charged" for five weeks of membership during which he did not receive any benefits. (Complaint, ¶ 11).[18]  Thus, by Held's calculations, he was "damaged" approximately $8.82 of the $87 cost of the 2010-2011 membership for himself and his wife. (Complaint, ¶ 12).  Held's analysis, however, actually highlights the individualized analyses the Court necessarily would be required to undertake in order to calculate not merely the amount of damage each class member may have incurred, but rather, whether each class member incurred any damage at all.

First, the Court would have to determine the amount of dues each member of the class actually paid.  This is no small feet given the fact that Club dues are anything but constant.  Dues have changed over time.  Dues varied depending on whether an individual fell under the CMC fee schedule or the AAA SNE fee schedule, both of which were different.  Dues varied depending on whether an individual's membership was just for a Primary member or a Primary and one or more Associate members.  Dues also varied depending on whether an individual had a Basic, Plus or Premier membership.  Likewise, the dues actually paid by any given individual can, and in many instances will be impacted by application of discounts the Club periodically offers.[19]  In short, there is no common denominator of fees charged to all members of the proposed class.

Even assuming everyone paid the same amount, which clearly is not the case, the Court would then have to evaluate the timing associated with each membership.  For example, Mr.

---

[18] As discussed above, record evidence clearly establishes otherwise.

[19] When Held initially joined CMC his membership fees were discounted by $15. (Wyatt Aff. ¶ 59).

Held joined CMC in August, 2004.  *Id.* at 76:12-17.  Held's membership was scheduled to renew on October 1, 2005 which was approximately 13 ½ months after he initially became a member. (Wyatt Aff. ¶ 59)  Assume for this analysis that he did not renew by October 1, 2005, but did so 10 days later on October 11th.  Because his membership would have been set for renewal on October 1, 2006, under Held's theory, he would have been cheated out of 10 days of membership.  In reality, however, Held effectively received an additional month of membership when he initially signed up.  Thus, if you were to net out his entire membership period dating back to when he first became a member in August, 2004 Held would still be ahead of the game by approximately 20 days.  Clearly, this type of detailed analysis of membership history cannot be done absent individualized inquiries.

Even assuming the Court and the parties reasonably could overcome the hurdles mentioned above, the analysis still would not be complete.  Again, Plaintiff's entire case hinges on the assumption that class members effectively were charged membership dues for a period of time in which they did not receive any Club benefits or services.  As discussed at length above, such is not the case.  Clearly, class members can and do utilize Club services and benefits during the 90 days following the stated renewal date.  If an individual in fact used services or took advantage of various discounts or other benefits, the value of such necessarily would factor into any damage calculation.

Although there are myriad examples, a few will make the point.  Taking Held himself as an example, he claims that he renewed late and was therefore damaged in an amount of $8.82.  If Held used his Club membership during that 5 week period to receive a hotel discount, clearly the value of that discount would be relevant.  In fact, if the value of the discount exceeded $8.82, Held would have financially benefitted, not been harmed, by the Club's renewal policy.  As

discussed above, there certainly is no way systemically, or on a class-wide basis to determine which Club members had similar fact patterns.

Held's own facts highlight yet another example.  For three consecutive years Held had a remarkably similar pattern.  Specifically, beginning in 2007 his membership was set for renewal on January 1st.  Each year Held let his membership renewal day pass without paying the requisite renewal dues.  Each February, however, which obviously is within the 90 day window at issue in this litigation, Held contacted the Club and requested road-side assistance.  Each year, pursuant to Club policy, Held received the requested service.  Importantly, he was not charged the $30 same day service fee that otherwise would have been applicable had he not already been a Club member.  Thus, even if the Court were to accept Held's theory that he "lost" approximately $8 dollars each year given the Club's renewal policy, in reality, because he was not charged an otherwise applicable $30 fee, he actually saved $22.  These facts once again highlight why Held personally does not have a viable claim.  Equally important, these facts highlight the irrefutable conclusion that determining whether class members were damaged will require individualized analyses.

> **3.**  **Determining Whether Class Members Were Aware of the Club's Renewal Policy Will Require Individualized Analyses**

The Club communicates with its members in many different ways.  Communication with each member is unique, and varies depending on the circumstances.  For example, a member can visit a branch office and have a conversation directly with a Club representative.  A member also can call the Club over the telephone and speak with a Club representative.  Notably, but not surprisingly, some of these verbal communications involve the Club's membership renewal

policies, and application of those policies to the facts and circumstances specific to an individual member.[20]  Once again, Held's own history proves to be instructive.

Held contacted the Club in February, 2010 to request road-side service. The AAA SNE representative who took Held's call explained to him that his dues were to have been paid the previous month.  The representative also referenced the Club's grace period for road-side assistance and informed Held that if he renewed his membership more than 90 days after the stated renewal date he would be charged a $30.00 fee if he needed roadside assistance.   Armed with this information, Held voluntarily agreed to pay his membership renewal fees. (Wyatt Aff. ¶ 71, Ex. K).  Clearly, it is impossible to determine on a class-wide basis whether each class member communicated verbally with the Club, and if so, whether the Club representative disclosed the renewal policy.

A class-wide analysis of written communications is equally impossible.  As discussed above, the Club sends multiple written communications, many of which are unique to specific members.  Determining what written materials were sent to each and every class member simply cannot be accomplished.  One thing that is clear, however, is that each member received membership renewal notices and updated membership cards that expressly set forth the new renewal date.  Determining which members saw such disclosures, however, would require individualized analyses.

Plaintiff has contended that the Court should look no further than the Club's handbook. He is wrong.  The handbook is merely one of many ways the Club communicates information to members.  Moreover, it is important not to lose sight of the fact that no singular version of the handbook was sent to all class members.  Rather, record evidence establishes that CMC and

---

[20] Numerous examples of this can be identified by reviewing the exemplar Call Center log attached as Wyatt Aff. Ex. I.

AAA SNE had different versions of the handbook.  Record evidence also establishes that the operative language in the handbook has changed numerous times throughout the proposed class period.  Moreover, record evidence substantiates the not terribly surprising conclusion that a relatively small percentage of individuals actually recall receiving the handbook, let alone reading its contents.[21]

**4.    The Applicability of Various Defenses Will Require Individualized Analyses**

In making a predominance determination, it is appropriate for the Court to consider whether a defendant is likely to raise one or more defenses specific to each putative class member. *Myers v. Hertz*, 624 F.3d 537, 551 (2d Cir. 2010) ("while it is well established that the existence of a defense potentially implicating different class members differently does not necessarily defeat class certification, it is equally well established that courts must consider potential defenses in assessing the predominance requirement…")  Here, the Club will assert various defenses that necessarily will require individualized inquiries.  For example, the Club intends to assert defenses such as the voluntary payment doctrine, waiver and statute of limitations.  As discussed at length above, the facts underlying such defenses necessarily will require extensive individualized analyses.

**B.    CLASS MEMBERS CANNOT READILY BE ASCERTAINED**

In addition to the requirements set forth in Rule 23, courts have recognized an implied requirement that a class must be adequately defined and clearly ascertainable.  *Biediger v. Quinnipiac Univ.,* 2010 U.S. Dist. LEXIS 50044, at *8 (D. Conn. May 20, 2010) ("The purpose of the ascertainability requirement is to ensure that the class is 'sufficiently definite so that it is

---

[21] *See,* Maronick Report at 6.

administratively feasible for the court to determine whether a particular individual is a member.'"). A class definition is insufficient if it requires "a fact-intensive determination as to class membership whereby determining membership would essentially require a mini-hearing on the merits of each class member's case, including their individual injury." *Wilson v. Toussie*, 2008 U.S. Dist. LEXIS 25469, at *12-13 (E.D.N.Y. March 31, 2008).

In the present case Plaintiff seeks to certify a class of "all persons who, at any time on or after January 19, 2005, purchased and paid for a new term of AAA SNE membership after their prior membership term expired, and whose new membership term was deemed by AAA SNE to have begun on or about the prior expiration date." The proposed class, however, is improperly overbroad in that it contains individuals who would not be entitled to relief under any of the asserted claims. And determining who might theoretically have a viable claim would essentially require a mini-hearing on the merits of each class member's case, including their individual injury. For this additional reason, this case should not proceed as a class action.

### C. PROCEEDING ON A CLASS-WIDE BASIS WOULD NOT BE MANAGEABLE - LET ALONE SUPERIOR

Plaintiff also failed to satisfy the superiority requirement. When determining whether a class action is the superior method of adjudication, the Court should assess the advantages and disadvantages of using the class action device in relation to other methods of adjudication. Rule 23(b)(3) identifies certain factors the Court must consider, including the likely difficulties in managing a class action. *Fed. R. Civ. P.* 23(b)(3).

In the present case manageability is a critical factor in evaluating whether a class action is superior. Resolving this case on a class-wide basis would require the Court to determine, among other things, which members: (1) availed themselves of Club services and / or other benefits during the 90 days following their stated renewal date; (2) were damaged as a result of the

Club's renewal policy; and / or (3) otherwise were aware of the Club's policy and voluntarily elected to renew their membership.

Given Plaintiff's inability to prove the elements of his claims on a class-wide basis, this Court will have to conduct a substantial number of individualized fact findings to determine class membership, liability and damages.  The need to conduct the vast majority of each lawsuit on an individualized basis destroys any benefit that class certification might otherwise offer.  *See, e.g., Danvers Motor Co. v. Ford Motor Co.,* 543 F.3d 141, 149 (3d Cir. 2008) (concluding that superiority requirement was not met because "[t]he multitude of individualized issues presented in plaintiffs' claims would entail complicated mini-litigations within the class action itself").

### D.   PLAINTIFF CANNOT ESTABLISH THAT HIS CLAIMS ARE TYPICAL

To succeed on a class certification motion, a plaintiff must prove that "the claims and defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3); *General Telephone Co. v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364 (1982). Courts have denied class certification for lack of typicality "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Gary Plastic Packaging Corp. v. Merrill Lynch,* 903 F.2d 176, 178 (2d Cir. 1989).  *See also, Baffa v. Donaldson,* 222 F.3d 52, 59 (2d Cir. 2000); *Gruber v. Prudential-Bache Secur., Inc.,* 679 F. Supp. 165, 183 (D. Conn. 1987).

Mr. Held cannot satisfy the typicality requirement for numerous reasons.  First, given the fact that he was working on numerous "back-dating" cases during his tenure with the Meiselman law firm, and his own sister was the named plaintiff in one of those cases, he will be extremely hard pressed to argue credibly that he did not "recognize" his possible claim against AAA SNE during any of the multiple years dating back to 2007 in which he let his January 1st membership

renewal date pass, but then called for road-side assistance each February.  Second, he will be hard pressed to explain away the conversation he had with a Club representative in February, 2010 during which the Club representative referenced the Club's grace period for road-side assistance and informed Held that if he renewed his membership more than 90 days after the stated renewal date he would be charged a $30.00 fee if he needed roadside assistance. Armed with this knowledge, he voluntarily elected to renew his membership.  Finally, Held cannot satisfy the typicality requirement because he will be unable, at a minimum, to establish the requisite element of damage, and thus, he cannot prevail on his individual claim.

For each of these numerous reasons, Plaintiff has failed to satisfy the requisite elements for class certification, and thus, Plaintiff's Motion should be denied.

### E.   PLAINTIFF'S RELIANCE ON *DUPLER* AND *ARGENTO* IS MISPLACED

Apparently recognizing the insurmountable hurdles ahead of him, Plaintiff attempts to turn a blind eye to the salient facts of this case.  Instead, Plaintiff repeatedly cites to *Dupler v. Costco Wholesale Corporation*, 249 F.R.D. 29 (E.D.N.Y. 2008) and suggests that the findings in that case are somehow dispositive.  They are not.  Moreover, to the extent the Court is inclined to look to analogous cases from other jurisdictions, AAA SNE respectfully directs the court to *Thompson v. Automobile Club of Southern California*, a case that is virtually on all fours with the present matter.

In *Thompson,* the plaintiff, who was represented by the same counsel as Mr. Held, asserted various claims under the same "back-dating" theory at issue here.  In response to plaintiff's motion for class certification the Automobile Club of Southern California presented evidence that members were entitled to receive benefits during a 95 day "grace period" following the stated renewal date.  The defendant also established that as long as the member renewed

during the grace period they were not charged fees that otherwise would have been charged had they simply signed up for a "new" membership. Likewise, the defendant submitted evidence that it communicated the renewal policy to members in a variety of ways, including oral disclosure to some members who called the club with questions about renewal options. In an order dated February 10, 2011, the California court denied plaintiff's motion for class certification, finding, among other things, class members were not readily ascertainable, common issues did not predominate, and a class action would not be a superior means to adjudicate that case. *See* Order (Sinclair Aff. Ex. 3).

Clearly, Mr. Held's counsel were well aware of the *Thompson* decision before they filed the pending motion for class certification here. Curiously, however, Held fails to even mention that clearly relevant decision. Instead, he repeatedly asks this Court to rely on two New York cases as the basis for granting class certification, *Dupler,* 249 F.R.D. 29 and *Argento v. Wal-Mart Stores, Inc.*, 888 N.Y.S.2d 117 (N.Y. App. Div. 2009), going so far as to assert that AAA SNE's renewal policy is "identical" to those of Costco's in *Dupler* and those of Sam's Club in *Argento*. *See, e.g.,* Memo of Law at 4. Given that fact that Held personally worked on the *Dupler* and *Argento* while an attorney at the Meiselman firm, he of all people should recognize that the facts and membership renewal policies in those cases differ significantly from those presented in this case.

Unlike the situation presented here, in *Dupler* Costco did not have a policy that allowed members to make purchases after their expiration dates unless they first renewed (except for a short period of time when expired members were permitted to complete one shopping transaction). *Dupler*, 249 F.R.D. at 44. This stands in marked contrast to AAA SNE members who certainly are permitted to, and in fact routinely do, use the Club's benefits and services after

their renewal data.  Second, unlike this case, *Dupler* involved a single, uniform written disclosure document distributed to all putative class members.  *Dupler*, 249 F.R.D. at 37-38.  *See generally, In Re Countrywide Fin. Corp.*, 2011 WL 6325877, *7, n.3 (S.D. Ca, Dec. 16, 2011) (denying class certification and distinguishing *Dupler* because it involved use of form contracts).  Further, the court concluded that there was no indication Costco ever disclosed its membership renewal policy to anyone, in its written policy or in oral communications.  *Id.* at 39-40.  As discussed above, AAA SNE members discloses its policy through a variety of written and verbal communications, including membership renewal notices, on the membership card, and in telephone calls with members.  Finally, Costco did not have an enrollment fee or a same day service fee that could have made it economically beneficial to maintain continuity in a member's renewal date.

Held's reliance on *Argento* is equally misplaced.  The court's class certification decision in that case did not include any analysis of the Sam's Club renewal policy, nor did the court address any disclosure issues.  Rather, the court merely stated in a conclusory fashion that the class members "share common questions of fact or law with regard to the defendant's alleged backdating of renewal memberships."  *Argento*, 888 N.Y.S.2d at 119.  Accordingly, Held's reliance on *Dupler* and *Argento* is sorely misplaced.  Instead, the California court's decision in *Thompson* provides a detailed analysis of relevant facts, the vast majority of which are virtually identical to those presented here.  Thus, like *Thompson*, Plaintiff's motion for class certification should be denied.

## IV.     CONCLUSION

For each of the foregoing reasons set forth above, AAA SNE respectfully requests that this Court deny Plaintiff's Motion for Class Certification.


Dated:  March 15, 2011                          Respectfully submitted,

                                                THE DEFENDANT,

                                                AAA SOUTHERN NEW ENGLAND,

                                                By its attorneys,


                                                  /s/ Kent D.B. Sinclair
                                                Kent D.B. Sinclair (ct14649)
                                                SEYFARTH SHAW LLP
                                                World Trade Center East
                                                Two Seaport Lane, Suite 300
                                                Boston, MA  02210-2028
                                                Tel:  (617) 946-4800
                                                Fax:  (617) 946-4801
                                                E-Mail:  ksinclair@seyfarth.com

                                                Daniel M. Blouin (ct22915) (*pro hac vice*)
                                                SEYFARTH SHAW LLP
                                                131 South Dearborn, Suite 2400
                                                Chicago, IL  60603
                                                Tel:  (312) 346-5000
                                                Fax:  (312) 346-7000
                                                E-Mail:  dblouin@seyfarth.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2012, a copy of the foregoing Defendant's Opposition to Class Certification was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ Kent D.B. Sinclair
Kent D.B. Sinclair (ct14649)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA  02210-2028
Tel:  (617) 946-4800
Fax:  (617) 946-4801
E-Mail:  ksinclair@seyfarth.com